The first case on the calendar this morning is Ware v. L-3 Vertex Aerospace. Okay, good morning. May it please the court, Stephen Bergstein for the plaintiff appellant. The question on appeal is whether the district court properly granted summary judgment on plaintiff's retaliation claim under the Title VII of the New York City Human Rights Law. There's also a hostile work environment claim under the New York City law. Let me start with retaliation. The district court said that no rational jury can find that that plaintiff was terminated from his position and that the only conclusion we can draw from this record is that the plaintiff resigned his position. And in doing so, the district court resolved disputed issues of fact. Plaintiff testified at his deposition that he, quote, never resigned on December 22nd, 2014. He also submitted a declaration, quote, I did not quit. Before we get to that issue, can I ask about the application of the New York City Human Rights Law and the state law here? I mean, there does seem to be pretty substantial case authority that these laws don't provide non-residents with a cause of action for discrimination outside of New York. Um, so, uh, so why isn't that something we should take notice of at this juncture? Uh, that issue preliminarily wasn't, I don't think that issue came up in this case. So we didn't have the opportunity to brief it. I would say that any such issue has been waived by defendant by not, um, by not asserting it at any time. Uh, and it's not in their appellate briefs. Um, I think this is an American corporation. He just happened to be in Afghanistan when this happened. Well, excuse me. It's an American corporation, but the plaintiff, as I understand it, is a resident, a permanent resident of Jacksonville, Florida. The company that he worked for seems to be based in Mississippi. He worked only in Afghanistan and was trained for that job in Mississippi. There's no indication that, uh, Mr. Ware ever set foot in New York in his life. Uh, there's, uh, uh, the only New York connection I could find in the record, and perhaps you can help me out and find more, is that the parent holding company of the company for which he worked is headquartered in New York, though incorporated in Delaware. But I didn't see any indication that anyone in New York knew that Mr. Ware existed, uh, let alone, uh, took any action in connection with his, uh, uh, termination or any other, uh, uh, discrimination against him or anything that occurred in Afghanistan. So can you help me out? I mean, what I understand your waiver point, uh, and that may be enough to carry the day, but it seems strange that we should apply a New York city ordinance under the facts that I just outlined. Okay. Uh, your honors summary of the New York connection sounds accurate to me, although I haven't reviewed that because I didn't anticipate that issue coming up today because it hasn't. Well, it was raised. It was raised in the, uh, granted in a footnote, uh, in, uh, the other sides, a brief, and you did respond with the waiver point. Uh, uh, but, uh, you did not risk, you had the opportunity to, to respond. I'm not blaming you, but, uh, you know, that's, that's, those are the facts. It was raised, albeit in a footnote and you were aware of it. It sounds like an argument that if they were serious about it, it would not have been relegated to a footnote. It would have been, you know, fully developed in their brief, but since anyway, your honor summary of the New York connection, it sounds right to me, but I haven't thought of that because I didn't see it coming, but, um, assuming waiver, um, there is no conclusive way to show that the plaintiff resigned his position because he testified, um, that he never resigned at a district court. And even with that, even with waiver, the title seven, this would not be applicable to the title seven claim. So the retaliation claim is solidly in front of us. Right. The, the only pure city law claim is the hostile work environment, but the, the, the damages claim, the big damages claim you, as, as always in these cases is the termination claim. And the district court, I think explicitly weighed the evidence on page 12. Um, she said plaintiff's sworn statements alone and insufficient to create a genuine issue of fact, given the way to the countervailing evidence and the counter whaling countervailing evidence in this case was simply statements by management that plaintiff had quit his job. So you have a clear issue of fact here about how plaintiff's termination ended. Um, that's what juries are for and getting over to the issue of pretext. And Mr. Bernstein, you may even be understating the case, your case in a way you say statements by management. It's basically Mr. Jardy. There's only, it's a two person phone call between Mr. Ware and Mr. Jardy. And Jardy says he quit during that conversation. Now there's some corroboration, I guess, because he made consistent statements right after, but there's no other witness to that conversation and no other documentation of what happened. Uh, it's not on tape or anything. So it's really a one-on-one call, isn't it? Correct. It's purely testimonial. The defendant does point to what about, what about the December 22nd email? Okay. I was just about to talk about that. There was an email right after plaintiff was fired in which Jardy says, um, this will confirm that you, um, we accept your resignation. This is right after that contentious phone call plaintiff says, yes, you will hear from my lawyer soon, Todd, for your discrimination. Uh, that's an offhand comment. I don't think we, what's, what's an offhand comment. What do you, well, the fact that he had, he began, where begins his response with the word? Yes. Um, you will hear from my lawyer soon that does not conclusively represented admission by plaintiff, you know, sure. I quit and, you know, good riddance to all of you. You know, that's sort of a verbal tick expressed in an email. Yes. You will hear from my lawyer soon. You know, the response to an email with the title resignation and it's, and it's responding to the phrase, we accept your resignation. Yes. That doesn't sound that ambiguous. Well, he didn't say yes, period. I, I, I re reaffirm my decision to resign. Uh, he, he just, you know, I don't think where's in a position to debate this issue. He had just been fired. He's totally bewildered at what happened because he didn't see it coming. And he was a highly regarded employee. Suddenly he's fired. And on the same day or the day after, yes, you will hear from my lawyer soon. It just sounds like a verbal tip that kind of, uh, offhand comment people making emails without really thinking about it. But is that going to foreclose a jury trial on whether the plaintiff was fired? Uh, I don't think that's an admission. Uh, but he had, I mean, he, he went on to say, uh, testify, I think in his deposition that he was not sure how his employment, um, ended. So that seems to me to be not entirely consistent with a position that he was fired, but that same line of testimony and deposition, he said he never resigned again, but not sure means, you know, you know, they're making an issue of it in his deposition. They keep asking him. Yes. Mr. Bernstein, he didn't, he didn't say, he, I think it's fair to say, and correct me if I'm wrong, that Mr. Ware has never testified that he said during that conversation, you're fired. Uh, there was no, the apprentice moment as far as where it testifies, but he does say that not being sure though, is that after the fact when they didn't renew his visa and he couldn't get back to Afghanistan, then he realized he was fired. It's something like that, right? That he says that highlights the ambiguity in all this. The question was, what do you think happened at the end of your employment? Honestly, I'm not sure. I thought I was terminated. I'm not sure. And then five, the next question, he answers the question. I never resigned. So this, you know, I get it. There's some ambiguities here with these, with these comments, but, but there's nothing in the way of a true admission from the plaintiff that he quit his job and I voluntarily resigned. He testified he couldn't resign. He couldn't afford to get to support his family. He needed the money. Why would he resign? Um, and, and, and no one, so, so that's really the argument here. Um, you know, the, the old cases on summary judgment tell us that there's an ambiguity in the evidence you leave for the jury. It doesn't, you don't simply need a diametrically opposed line of testimony and ambiguity is enough. All of this sounds like an ambiguity. What does yes mean in the email? What is, I'm not sure, uh, from, from, you know, I thought I was terminated. What does that mean? Um, that's, that's for the jury. I don't think we can, I don't think we can resolve this on the papers. So, you know, that's the, the essence of the plaintiff's argument on the prima facie case. The district court did not address the issue of pretext and maybe there can't be a pretext. You've reserved some, uh, uh, rebuttal time. Do you want to use it now or, or reserve it for rebuttal? I'll reserve it. I'll reserve it. So we'll hear, we'll hear from your colleague, Mr. Bassan. You're muted. Uh, you're muted, sir. Still, still muted. Okay. I think you're okay now. Okay. Um, so I apologize. Ned Bassan on behalf of Appellees. Um, I think the, uh, the panel addressed, uh, that, uh, Mr. Ware's retaliation claim, uh, is contradicted by his very own words. Uh, he said, yes, I think we all know what yes means. The president Clinton had a different view with that, but nevertheless, I think we all know what yes means. He testified at deposition, uh, that he was not sure how I was employment terminated. And there is a corroborating evidence, uh, that he resigned. The corroborating evidence is that, uh, right after the phone call, um, an employee of, of Vertex, uh, named Felicia Taylor, who by the way, is an African-American, uh, came into Jardy's office and Jardy told her on the spot that, uh, where resigned. Then Jardy immediately sent, communicated with human resources saying that, uh, where resigned human resources said, confirm it. And he sent the email confirming it. And then the records of the company show that they listed him as resigning. And doesn't all of that, excuse me, Mr. Basin, doesn't all of that just come back to Jardy? Uh, if Jardy decided he wanted to say that, um, uh, where quit, then it would follow. He would do exactly all of those things. Uh, you know, obviously, uh, it is some corroboration that he Uh, but I'm not sure that any of those things are even admissible in evidence. No one's saying it's a, uh, recent fabrication, uh, that, um, uh, Mr. Ware quit. Uh, Mr. Jardy sent that email right away saying you quit. Uh, then he tells people he quit. Uh, I mean that, that he just said, said the same, said the same thing several times that he's going to say in testimony about what happened during the conversation. Well, your honor, the same Jardy, uh, extended Ware's employment when Ware's contract of employment ended after, uh, Ware alleges he complained of discrimination on September 30. He alleges he complained of discrimination on September 30. On November 12th, his employment ended and if Jardy wanted a perfect opportunity to terminate Ware, why would he have extended his employment when he had no obligation to do so? His employment contract was over. Plus on November 27th, this same Jardy gave Ware what is admitted as a stellar performance review. Can I just ask about the conversation, uh, when, uh, Mr. Jardy tells Taylor he's resigned. Is that, does that occur immediately after he hangs up the phone? Is your theory of admissibility that that's a present sense impression? Yes, it was immediate. She walked into his office according to both their testimony and deposition as he was hanging up the phone. So it occurred immediately. There was, there was no, uh, there was no delay, delay in that whatsoever. Um, so we also have, uh, the hostile work environment claim. Um, we have the question of waiver and the panel has addressed that. And I would submit that it's not possible to waive this because it is a matter of due process and it is a matter of process recognized by the Supreme Court of the United States. There's a case Phillips Petroleum Company against shoots. S H U T T S four 72 us seven 97 1985 in which the Supreme Court says that with the absence of any connection, uh, to a state here, a city as a matter of due process, that law cannot be applied. And was that a case Mr. Bassan in which the Supreme Court said that an argument that your due process rights are violated by the, uh, by a particular choice of law is something that cannot be waived. No, they did not say it cannot be waived. That was an issue that was, was raised and it was held that it was a due process violation. Don't, uh, parties all the time, uh, uh, enter choice of law provisions that are then binding on them. Uh, and indeed, isn't it somewhat routine for us to find that parties don't address choice of law? And then we say, well, they all cite New York law. So, uh, I guess that means they've agreed that New York law is binding and we need not address the choice of law question. Well, your Honor, in that Supreme Court case, although the Supreme Court didn't use the word waive, the Supreme Court did say two things. One is the fact that, that a party chose this forum and participated in the litigation does not matter. And secondly, uh, I think they also said that the, the, the choice of law doesn't matter either. It's a question of, is there a connection or a sufficient connection? And this court has held that the New York City human rights law only applies to people who work in New York. Now on the hostile work environment claim, I would like to point out that, uh, Pellant Ware in his own writing, just less than a month before he, his employment ended in employee comments to his evaluation and performance review wrote managing 3000 lines was a chore, but I enjoyed it. And with the help of my supply team got it running efficiently. There was not a hint of dissatisfaction with his job, let alone any sort of hostile work environment. This is again, where speaking contemporaneously, even though where is now claiming on appeal that by then he already complained about discrimination a number of times. I just don't think that that's credible. And all of, as the district court judge said, uh, what, where has, in terms of the elements of hostile work environment is no concrete particulars and most importantly, no comparators. I mean, his comparators are conclusory white employees were treated better, which white employees, how are they treated better? What happened? There were 14 months of discovery in this case, 14 months, and he has come up with nothing other than his own conclusions saying that this is the way it is. And essentially that's all I have. Thank you, Mr. Bassin. We'll hear a rebuttal. Sure. Um, on the hostile environment, it sounds like a credibility argument to me that, that doesn't mean he was happy with the way things were going at work. Um, he, um, testified on in various ways that this workplace was not hospitable to black employees. And he said as such to Jardee only a couple of months before the plaintiff was fired. And under the city law, if you're treated less well than white employees, that's enough to make out a hostile work environment claim a big difference from title seven. You don't need to identify comparators under the New York city human rights law. Um, the district court did not address the issue of pretext on the retaliation claim. And to the extent pretext, could you, could you address, uh, Mr. Bassin, two points that Mr. Bassin made, uh, uh, one that after the, um, uh, alleged complaints by Mr. Ware about discrimination, uh, uh, Mr. Jardee, uh, gave him an outstanding job evaluation, something that you yourself rely on in another context. Uh, and then secondly, uh, a timing matter I had not realized Mr. Bassin says that Mr. Jardee actually extended his employment contract in November again, after the complaint of discrimination. Uh, why, how does it make sense then that, uh, Mr. Jardee would, uh, uh, take a pretext, uh, to fire, uh, Mr. Ware, uh, in retaliation for something he said in September, when Ware could have just, uh, uh, not renewed his employment, uh, uh, back in November and didn't need, if he was looking for pretexts, uh, to give an outstanding job evaluation. So how does that make sense? Because there was no way to, um, have a plausible justification for the plaintiff's termination prior to, um, the, the finding that the plaintiff had misused the credit card, that the, the, the credit card misuse gives Jardee a way to plausibly argue that the plaintiff deserves to be fired now. Uh, prior to that, there was no way to justify plaintiff's termination, unless you just want to come in and say you're fired. And that doesn't really work in the workplace. You, you normally have some justification that you can rely on. It may not be true, but it's, it's, it's a neutral reason. And then the plaintiff has to come up with a pretextual, uh, argument. And the pretext here was, and the opportunity for, for Jardee to do this was to credit card. And he didn't do that either. He didn't say, uh, you're fired because of this credit card business. Uh, he said you quit. Well, that's supports our argument. If he's going to, um, lie about whether the plaintiff quit, um, that sort of that's pretext. And, but, but the opportunity, but by then, by the time that plaintiff was fired, the credit card situation had arisen and HR was talking about it and Jardee knew about it. And, you know, this is the opportunity for, for Jardee to finally pull the trigger. And we know there are cases in the circuit that say if management waits for the appropriate time to fire somebody that can be, that creates an issue of fact on causation. Um, all of this sounds like, like fact issues to me. Plaintiff told Jardee on September 30, if you're discriminating against me and you're holding me to different standards because of my race. And a few months later, plaintiff is fired and they lie about, uh, whether plaintiff quit, which gives them cover, um, because the, the unofficial reason to the extent that arises in the credit card, uh, misuse wasn't enough to fire somebody. And HR only recommended a three-day suspension and where pays it back. And so to the extent they're relying on the credit card episode, that's pretext to, you know, when we get into issues of employer intent, which is what we're talking about here about timing and you got a positive review and you make out a prima facie case, um, on its face, you know, these are issues for the jury. These issues can't be decided on paper. But you, you say, uh, your client, uh, uh, didn't quit, but, uh, he never says that. Well, he says, I never resigned. That's, that's the same thing. That's page, uh, 175 of the record, uh, page 98 of his deposition. I never resigned. He said that, uh, three or four times and he said it in his affidavits. Um, he said it in, in deposition and the district court recognized on page 12, that plaintiff, uh, said under oath that he did not quit, you know, did not quit means he didn't resign. And the only way you leave your position, if you didn't quit is if you're fired and you know, these, you know, we're getting into, we're getting into the weeds here. I think about, you know, what does it mean if you say I didn't quit? You know, it means you didn't resign. Well, how did he leave his job? What happened? Um, it can only mean he was fired and you know, these are issues for the jury and there is no compelling evidence on defendants side of the, uh, that, that demonstrates conclusively the point of was in fact fired. It all hinges on the word. Yes. Right. That's, that's correct. But I, I don't think a yes in that context, um, conclusively means that he, he agreed, he testified he couldn't have quit and he, he needed the money. It was a well-paying job actually. Why would he quit? Um, he, these are arguments you make in summation. Okay. Ladies and gentlemen, you heard, he wrote the word yes, but what does that really mean when you're sending emails these days? People are cavalier in the use of language when they send emails, unfortunately, you never think it's going end up in litigation, but here we are. And I don't think that's enough to foreclose a trial on this issue. Thank you. Thank you both. We will take the matter under advisement. Nicely done. Unusual format.